**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | 2:18-cr-00334 |
| | ) | |
| | ) | |
| THOMAS GEORGE STANKO, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

**Mark R. Hornak, Chief United States District Judge**

Pending before the Court is Defendant Thomas Stanko's Motion to Suppress (ECF No. 43), in which Mr. Stanko seeks to suppress physical evidence—seventeen firearms, several rounds of ammunition, and a few notes handwritten by Mr. Stanko—seized during searches of Mr. Stanko's residence and rental storage unit pursuant to warrants issued by state court judges.

Upon review of Mr. Stanko's Motion to Suppress, the filings of record which the Court may properly consider, and the arguments counsel presented at oral argument, the Court denies Mr. Stanko's Motion to Suppress. Based on the totality of circumstances presented on the faces of both the residence and storage unit search warrant affidavits, the Court concludes that the state court judge who authorized the search warrants had a substantial basis to conclude that probable cause existed to support the searches. And even if the Court concluded otherwise, the good faith exception applies in these circumstances, and suppression of the seized evidence would not be required. Mr. Stanko's suppression motion will therefore be denied.

Also before the Court are several other pretrial motions[1] filed by Mr. Stanko. (ECF Nos. 37, 38, 39, 40, and 41.) For the reasons that follow, the Court grants in part and denies in part Mr. Stanko's five remaining pretrial motions.

## I.   **BACKGROUND**

On December 12, 2018, Mr. Stanko was federally indicted and charged with two counts of unlawful possession of firearms and ammunition, based on his status as a convicted felon, in violation of 18 U.S.C. § 922(g)(1). (ECF Nos. 1 and 2.) These charges stem from physical evidence seized during searches executed by Pennsylvania State Troopers at Mr. Stanko's residence ("Residence" or "Residence Warrant Affidavit") and at a storage unit rented by Mr. Stanko ("Storage Unit" or "Storage Unit Warrant Affidavit"). The fruit of these searches include seventeen firearms, several rounds of ammunition, as well as a few notes handwritten by Mr. Stanko. (ECF Nos. 50 and 51.)

Following the indictment, Mr. Stanko sought to suppress all evidence seized from the Residence and Storage Unit, arguing that the search warrant affidavits for both locations lacked probable cause. In addition to his Motion to Suppress, Mr. Stanko moved to compel certain evidentiary disclosures from the Government. (ECF Nos. 39–41.) On October 5, 2020, the Government responded only to the pending pretrial motions for discovery disclosures. (ECF No. 49.)

A few weeks later on October 27, 2020, the Government filed a superseding indictment charging Mr. Stanko with the same offenses, but adding language to account for § 922(g)'s specific knowledge element, as now required following the Supreme Court's decision in *Rehaif v. United States*, 139 S. Ct. 2191, 2200 (2019) (concluding that "the Government must prove both that the

---

[1] Mr. Stanko's additional pending pretrial motions are as follows: Motion to Produce 404(b) and 609 Evidence (ECF No. 37); Motion to Compel Disclosure of Plea Bargains, Preferential Treatment, and Promises to Witnesses (ECF No. 38); Motion for Discovery (ECF No. 39); Motion to Compel Disclosure of Experts (ECF No. 40); and Motion for Production of Jencks Material (ECF No. 41).

defendant knew he possessed a firearm and that he knew he belonged to the relevant category of persons barred from possessing a firearm"). Mr. Stanko then supplemented his earlier-filed Motion to Suppress with additional briefing, ECF No. 63, to which the Government responded at ECF No. 64. The Court held oral argument on the Motion to Suppress. During that proceeding, neither Mr. Stanko nor the Government sought to present testimony or evidence outside the written record as reflected on the docket. The record is now closed, and all motions pending before the Court are ripe for disposition.

## II.   **FACTUAL FINDINGS**

"On a motion to suppress evidence, the trial judge sits as the finder of fact." *United States v. France*, 414 F. Supp. 3d 747, 750 (W.D. Pa. 2019) (citing *United States v. Harris*, 884 F. Supp. 2d 383, 387 n.2 (W.D. Pa. 2012)). Accordingly, a district court judge assesses the credibility of witnesses, weighs the evidence, and draws any appropriate conclusions and inferences from the evidence. *Id*. At the hearing of March 2, 2021, the Court heard argument only as to the legal issues relevant to Mr. Stanko's Motion to Suppress. As a result, the Court considers only the parties' briefing and exhibits in making its factual findings. The central exhibits before the Court include the two search warrant applications relied on for the searches of Mr. Stanko's Residence and rental Storage Unit, both entitled "Application for Search Warrant and Authorization"—the least-redacted versions of which can be found at ECF Nos. 49-1 and 63-2. A judge for the Court of Common Pleas of Westmoreland County, Pennsylvania ("State Court Judge") approved both search warrant applications.

In addition to the briefing and exhibits before the Court, Mr. Stanko submitted four audio recordings of phone conversations that Mr. Stanko had with his mother and/or girlfriend while in

custody at Westmoreland County Prison.[2] (*See* "Remark" filed on December 7, 2020, and ECF No. 70.) The Court observes that both search warrant applications reference and paraphrase the substance of these recordings. The Government objects to the Court's consideration of the substance of these audio recordings as part of the evidentiary record, outside the paraphrased summaries presented in the warrant affidavits. (ECF No. 64.)

As a threshold matter, the Court must determine whether to consider the substance of the jail audio recordings submitted by Mr. Stanko as part of the evidentiary record. In resolving (1) the legality of the search warrants' issuance and (2) the law enforcement officials' reliance on those warrants in executing the searches, the Court concludes as follows. First, the Court does not consider the audio recordings' substance—outside what was paraphrased in the warrant affidavits—in determining whether the State Court Judge had a substantial basis to conclude that information proffered in the affidavits established probable cause. *See United States v. Folks*, 452 F. Supp. 3d 238, 254 (W.D. Pa. 2006) (citing *United States v. Whitner*, 219 F.3d 289, 295-96 (3d Cir. 2000)) ("[T]he District Court is restricted to viewing only the information confined by the 'four corners' of the affidavit before the magistrate."). Thus, the Court will only consider what was before the State Court Judge, *i.e.*, the face of the affidavits, which include the affiant's paraphrased versions of those jail audio recordings.

The Government contends as a secondary argument, however, that should the Court conclude no substantial basis existed for the State Court Judge's probable cause determination, the good faith exception doctrine applies to uphold both searches' legitimacy and the fruits seized. In assessing whether the good faith exception extends to the police officers' reliance on the issued warrants, the

---

[2] The Court will hereafter refer to these audio recordings as the "jail audio recordings" or "jail phone calls." The four audio recording files are titled as follows: "08-20-18 18-09.mp3; 08-20-18 18-19.mp3; 08-20-18 - 20-27.mp3; and, 08-23-18 - 19-07.mp3." (ECF No. 70.)

Court concludes that the jail audio recordings are relevant to its good faith exception analysis. As a result, the Court concludes that it is proper for it to consider the jail audio recordings' substance for that specific purpose. *See United States v. Leon*, 468 U.S. 897, 922 n.23 (1984) (instructing that "all of the circumstances . . . may be considered" when assessing "whether a reasonably well trained officer would have known that the search was illegal"). Having resolved the scope of the evidentiary record, the Court now summarizes its findings.

### A. <u>Residence Search Warrant</u>

On August 22, 2018, Pennsylvania State Troopers executed a search warrant at Mr. Stanko's Residence: 339 White Fence Lane, Unity Township, Westmoreland County, Pennsylvania. (ECF No. 49-1.) Mr. Stanko's mother, Almira Stanko, resides at this address, but Mr. Stanko is "the owner and holder of the deed to said property." (*Id*. at 4.) The Residence Warrant Affidavit outlined the following indicia as the basis for probable cause to believe illegal firearms were located on the property as well as "handwritten letters, instructions[,] and other types of mail correspondence," through which Mr. Stanko purportedly sought to remove and conceal the firearms. (*Id*. at 3.) First, the warrant affidavit describes a tip law enforcement received from an individual whose identity is redacted in the Exhibit presented to the Court, but who is described as "regularly speak[ing] with and visit[ing] . . . Almira Stanko." (*Id*.) While visiting Almira Stanko at the Residence on Saturday, April 21, 2018, or Sunday, April 22, 2018, this person "observed a [loaded] small caliber semi-automatic pistol in a holster" hidden in the back of a clock. (*Id*.)

Next, the Residence Warrant Affidavit chronologically paraphrases the recorded jail audio conversations between Mr. Stanko and his girlfriend, Rebecca Pravlik, as well as his mother, Almira Stanko. (*Id*.) The conversations occurred throughout the evening on August 20, 2018, while Mr. Stanko was in custody at Westmoreland County Prison. (*Id*.) The Court summarizes the affiant's

material observations of those conversations as follows: Mr. Stanko and his mother discussed a clock "that she had given [Mr. Stanko's son] against his wishes," at which point in the call, Mrs. Stanko "indicated that she had found something within the clock and knows all about it." (*Id*. at 5.) Mrs. Stanko explained that she found the item because the clock felt "heavy." (*Id*.) Mr. Stanko then asked his mother whether the item was still in the home, and his mother "confirmed that the item is currently in a drawer in [Mr. Stanko's] deceased father's bedroom." (*Id*.) Mr. Stanko then "began to repeatedly say something to the effect of, 3 or 4 more in the basement," which the affiant indicated he believed to be referencing more firearms. (*Id*.) Finally, Mr. Stanko and his mother continued to briefly discuss Christmas decorations in the Residence's basement. (*Id*.) Mr. Stanko told "Almira directly not to get rid of that Christmas stuff." (*Id*.)

Next, the affiant documented a paraphrased version of Mr. Stanko's phone conversation with his girlfriend, Ms. Pravlik, which occurred later in the evening on August 20, 2018. During the conversation, the affiant heard Mr. Stanko tell Ms. Pravlik that "his mother is supposed to speak with his son about returning a clock," and although Mr. Stanko spoke in whispers, the affiant then heard Mr. Stanko ask Ms. Pravlik "if Almira [his mother] had told her what's inside the clock." (*Id*.) Following that question, Mr. Stanko then informed Ms. Pravlik that he told his mother not to dispose of the Christmas decorations. (*Id*.) Throughout the conversation, Ms. Pravlik is heard responding with affirmations such as "uh hum," "yah," "gotcha," and "right-right." (*Id*.) Finally, Mr. Stanko is heard "whispering to the effect of, one is my dad's—3 are mine" and to "bind-em." (*Id*.)

Based on the foregoing, the State Court Judge authorized the search of Mr. Stanko's Residence. The Pennsylvania State Police executed the Residence search on August 22, 2018. The fruits of the search include four firearms and ammunition as well as a birthday greeting card and two envelopes from Mr. Stanko, one containing eight handwritten pages and another containing

two handwritten pages as well as a fax coversheet. (*Id*. at 9.)

    **B.  <u>Storage Unit Search Warrant</u>**

A few weeks later on August 29, 2018, the Pennsylvania State Police executed a second search warrant at Mr. Stanko's rental garage or storage unit located at "the street address of 325 and 327 Walnut Avenue, city of Greensburg, Westmoreland County." (ECF No. 63-2, at 3.) The warrant affidavit sought to search the "entire contents of the storage garage" including "any vehicles and/or separately secured compartments within." (*Id*.) Mr. Stanko owns two Harley Davidson motorcycles as well as a 1981 Pontiac Firebird with vehicle identification numbers ("VINs") that match the VINs assigned to the vehicles later found within the Storage Unit, and his registration of such vehicles was referenced in the Storage Unit Search Warrant Affidavit. (*Id*. at 5.) The Court summarizes the indicia of probable cause that the Storage Unit Warrant Affidavit details as follows.

In April 2018, Pennsylvania State Troopers spoke with several employees of the Westmoreland County Housing Authority, the entity that owns the subject Storage Unit, and confirmed that Mr. Stanko rented one of the units. (*Id*. at 4.) The affidavit provides that one employee confirmed that Mr. Stanko kept a "show car" in the unit. (*Id*.) Neither the owner of the Storage Unit nor its employees with whom the Troopers spoke had access to Mr. Stanko's unit. Also in April 2018, a Trooper interviewed a female named Marcie Nibarger who had lived with Mr Stanko for nine years. (*Id*.) Ms. Nibarger advised that Mr. Stanko rented a unit through the Westmoreland County Housing Authority, and that she believed Stanko stored two Harley Davidson motorcycles and a "show car" there. (*Id*.) According to the affidavit, she further "reported that [Mr. Stanko] kept firearms in the trunk of the vehicle." (*Id*.)

A few months later in August 2018, the affiant spoke with another employee who works at

the Westmoreland Housing Authority Office. (*Id.*) This employee advised that Mr. Stanko paid $300 via MoneyGram on January 5, 2018, for one year's rent of the Storage Unit. (*Id.*) The employee further noted that Mr. Stanko was the only person paying rent for a storage unit at the Walnut Avenue location at that time.[3] (*Id.*) The Storage Unit Warrant Affidavit also relies on the August 2018 Westmoreland County Prison audio recordings referenced in the Residence Warrant Affidavit, as well as a handwritten note that Westmoreland County Prison Staff confiscated as "contraband" from Mr. Stanko "immediately after his visitations with [his girlfriend and mother]." (*Id.*) The confiscated note, written by Mr. Stanko, contained the statement, "Do they know anything about my garage?"; discussed care of a car in the garage; and included a request to pay the garage unit rent via "money order or check, no cash." (*Id.*)

On August 28, 2018, a Trooper spoke with a witness referred to as Person 2 ("P2"). (*Id.* at 6.) P2 told law enforcement that in a conversation P2 had with Mr. Stanko on August 27, 2018, Mr. Stanko spoke in a whisper and "used hand gestures (index finger and thumb raised, depicting a gun)" allegedly to convey that guns were in his garage. (*Id.*) P2 stated that Mr. Stanko had previously told P2 that Mr. Stanko's Storage Unit housed a Harley Davidson motorcycle, a "show car," an ATV, and other items. Finally, the Storage Unit Warrant Affidavit referenced the fruits of the Residence search. (*Id.* at 5.) The affidavit also referenced the sighting prior to the Residence search of a loaded semi-automatic handgun in the back of a clock at the Residence.

Based on the foregoing, the State Court Judge authorized the Storage Unit search. The Pennsylvania State Police conducted the search and found thirteen firearms and several rounds of ammunition in the Storage Unit. (*Id.* at 7.)

---

[3] The Storage Unit Warrant Affidavit that was before the issuing judge also included a copy of the MoneyGram payment, "written to the Walnut Avenue Apartments" and "purported to be signed by [Mr. Stanko] with his personal address listed on the bottom." (ECF No. 63-2, at 4, 9.)

III.   **DISCUSSION**

Mr. Stanko argues that both the Residence and Storage Unit searches violate the Fourth Amendment because the underlying warrant affidavits lacked sufficient showings of probable cause. He contends that both search warrant affidavits were so lacking in indicia of probable cause that the issuing authority had no substantial basis to conclude that probable cause existed. Thus, Mr. Stanko moves to exclude all physical evidence seized during those searches as fruit of the poisonous tree. The Court will first canvass the applicable law and will then address the parties' arguments relative to the searches at Mr. Stanko's Residence and Storage Unit.

A.   **Motion to Suppress**

The Fourth Amendment of the United States Constitution serves to protect the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches." U.S. Const. amend. IV. It further provides that "no Warrants shall issue but upon probable cause supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *Id*. Mr. Stanko only challenges the State Court Judge's issuance of the warrants to search his Residence and Storage Unit on the basis that the warrants lacked probable cause. As such, whether those warrant affidavits satisfy the Fourth Amendment's probable cause requirement will be this Opinion's focus.

"The threshold requirement for the issuance of a warrant is probable cause." *United States v. Ritter*, 416 F.3d 258, 262 (3d Cir. 2005). The test for this threshold requirement is "whether the magistrate had a 'substantial basis' for concluding that probable cause was present." *Id*. (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)). In determining whether a "substantial basis" exists, a district court must assess "the totality of the circumstances" that was before the issuing authority. The Third Circuit has cautioned that this after-the-fact assessment "should not take the form of *de*

*novo* review." *Id.* (internal quotation marks omitted) (citing *United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-Seven Cents ($92,422.57)*, 307 F.3d 137, 146 (3d Cir. 2002)). Rather, a district court's review for "substantial basis" is "one step removed from a directed probable cause" analysis: courts must pay "great deference" to a State Court Judge's determination and should not "invalidate [warrants] by interpreting [affidavits] in a hypertechnical, rather than a commonsense, manner." *Id.* at 264 & n.8 (quoting *Gates*, 462 U.S. at 236 (alterations in original) (quoting *Spinelli v. United States*, 393 U.S. 410, 41 (1969))). Finally, a reviewing court is confined "to the facts that were before the [State Court Judge], *i.e.*, the affidavit, and [the reviewing court may] not consider information from other portions of the record." *United States v. Jones*, 994 F.2d 1051, 1055 (3d Cir. 1993). "Stated otherwise, the District Court is restricted to viewing only the information confined by the 'four corners' of the affidavit before the magistrate." *United States v. Folks*, 452 F. Supp. 3d 238, 254 (W.D. Pa. 2006) (citing *United States v. Whitner*, 219 F.3d 289, 295–96 (3d Cir. 2000)).

The two issues before the Court are: (1) whether the indicia of probable cause set forth in the Residence Warrant Affidavit—namely the observations made by an individual, who is described as close with Almira Stanko, while visiting the house together with the summarized contents of Mr. Stanko's jail audio recordings—is enough for this Court to conclude that the State Court Judge had a "substantial basis" to conclude there was probable cause to believe that Mr. Stanko had illegally possessed firearms and/or incriminating correspondence at the Residence; and (2) whether the Storage Unit Warrant Affidavit's indicia of probable cause—the various conversations that law enforcement had with the Storage Unit employees; statements made to law enforcement by an individual who formerly lived with Mr. Stanko for many years; the summarized content of the jail audio recordings; a confiscated note written by Mr. Stanko; a conversation reported to law

enforcement officers in which Mr. Stanko referenced guns in his garage; and finally, the fruits of the Residence Search—is sufficient for this Court to conclude that the State Court Judge had a "substantial basis" to conclude that probable cause existed.

As explained below, the Court concludes that based on the totality of circumstances presented by both warrant affidavits, the State Court Judge had a substantial basis to conclude that probable cause existed to search both the Residence and Storage Unit. And even if this Court were to conclude that there actually was not a substantial basis for the issuing State Court Judge to determine that probable cause existed, the Court concludes that the good faith exception applies and would nonetheless decline to suppress the fruits of either search.

### 1. **The Residence Search: Probable Cause**

Mr. Stanko argues that the State Court Judge had no substantial basis to conclude there was probable cause sufficient to issue the Residence warrant because (1) the Residence Warrant Affidavit "relies on information supplied by an individual ('Person 1') who has not been tested or proven as reliable nor has his information been sufficiently corroborated by independent investigation," and (2) the affidavit relied on stale information—Person 1's statements were made "months prior to the execution of the warrant[.]" (ECF No. 63, at 4, 5.)

In opposition, the Government argues that Person 1's observations included in the Residence Warrant Affidavit were corroborated by the paraphrased jail audio recordings also included within the affidavit. (ECF No. 64, at 4–5.) The Government highlights that on those calls, Almira Stanko discusses a "heavy" item in the clock, and that she had moved the heavy item to an upstairs bedroom in the target Residence. (*Id*.) As for Mr. Stanko's stale-information argument, the Government contends that the information relied upon in the affidavit is not stale because Mr. Stanko's "mother affirmed that she still possessed the firearm at the target residence a mere two

days before the warrant was sworn." (*Id*. at 6.) Any in any event, the Government argues that if the Court were to disregard the audio recordings and only rely on Person 1's April 2018 statements, the affidavit's information "would still not have been stale as the possession of firearms is considered a continuing offense [, and further, the fact that] the defendant had been incarcerated and lacked the opportunity to remove the evidence" weighs against a finding of staleness. (*Id*.)

### a.  <u>Reliance on the Affiant's Sources</u>

First, the Court concludes that the State Court Judge had a substantial basis to conclude there was probable cause to search the Residence because the August 2018 jail recordings sufficiently corroborate Person 1's statements. Thus, the State Court Judge could rely on these statements in making a common-sense probable cause determination.

In determining whether probable cause exists, a judge must make a "practical, common sense judgment" based on the totality of the circumstances presented by a warrant affidavit, circumstances which may include "hearsay information" supplied by informants/witnesses. *Illinois v. Gates*, 462 U.S. 213, 235, 244 (1983). According to the Third Circuit and Supreme Court, reviewing courts must make that "practical, common-sense decision" by determining "whether, given all the circumstances set forth in the affidavit[,] . . . including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Yusef*, 461 F.3d 374, 390 (3d Cir. 2006) (alterations and omissions in original) (quoting *Gates*, 462 U.S. at 235). The "veracity or reliability and . . . basis of knowledge" of an informant should not be viewed "as entirely separate and independent requirements to be rigidly exacted in every case." *Gates,* 462 U.S. at 230. As such, an informant's statements "are not presumed to credible," but the government may "show by the totality of the circumstances . . . that the information has been corroborated

through independent investigation." *Yusef*, 461 F.3d at 384–85 (citing *Ritter*, 416 F.3d at 263). In sum, a probable cause determination requires courts "to consider the cumulative weight of the information set forth by the investigating officer in connection with reasonable inferences that the officer is permitted to make based upon the officer's specialized training and experiences." *Id*. (citing *United States v. Arvizu,* 534 U.S. 266, 275 (2002)).

Here, the Court concludes that the August 2018 jail audio recordings as paraphrased within the Residence Warrant Affidavit corroborated Person 1's[4] statements to law enforcement, such that Person 1's credibility was established through a totality-of the-circumstances lens.

As stated in the Residence Warrant Affidavit, Almira Stanko referred to a heavy item she found in the clock and that she moved that item to an upstairs bedroom, which is consistent with Person 1's report of finding a gun in the back of a clock at the Residence.[5] Moreover, the affidavit makes clear that the informant was familiar with Almira Stanko and would visit the Residence often, which bolsters Person 1's credibility and further establishes that the State Court Judge had a substantial basis to conclude there was "a fair probability that contraband or evidence of a crime will be found in a particular place." *Yusef*, 461 F.3d at 390; *see Teeple v. Carabba*, No. 07-02976, 2009 WL 5033964, at *23 (E.D. Pa. Dec. 22, 2009) (noting that although informants are not presumed to be credible, it could infer the informant's credibility where the affidavit "establish[d] that a named

---

[4] Although this informant's identity (Person 1) is redacted in both the Residence and Storage Unit Warrant Affidavit Exhibits before this Court, and another informant's identity is redacted only in the Storage Unit Warrant Affidavit Exhibit (Person 2)—out of safety concerns raised by the Government—the informants' identities were unredacted in the affidavits that were before the State Court Judge. And no party raised any issue before this Court that the fact of such redactions was an issue that should impact this Court's consideration of the issues raised by the suppression motion.

[5] Mr. Stanko argues that because his mother had mentioned giving the clock to Mr. Stanko's son, there is likely some confusion as to "which clock" is being discussed, and that it cannot be determined if they were talking about the same clock. That argument attempts to create an issue where none exists. The visiting witness saw the gun in the clock while the clock was at the Residence. Mr. Stanko's mother spoke about a heavy object in the clock at the same residence, and that she took the object from the back of the clock and placed it in a dresser drawer in an upstairs bedroom of the Residence. At that point, the clock became irrelevant, since the object was not in the clock, but in a dresser drawer, and still in the Residence.

informant . . . was familiar with [the plaintiff]" as well as the details of the alleged criminal activity). Here, taking together the "cumulative weight" of the information presented by the Residence Warrant Affidavit—Person 1's statements, the later-paraphrased jail audio recordings that corroborated Person 1's statements, and the reasonable inferences that the affiant officer was permitted to make based on experience—the State Court Judge's probable cause determination, based on the totality of circumstances presented by the affidavit, was grounded in a substantially based belief that there was a "fair probability" firearms and/or correspondence regarding concealment of those firearms would be found at the Residence. *Yusef*, 461 F.3d at 390.

### b. Staleness

Second, the Court concludes that the four-month passage of time between Person 1's statements to law enforcement in April 2018 and the execution of the Residence search in August 2018 does not render the information in the Residence Warrant Affidavit impermissibly stale. "The age of the information supporting a warrant application is a factor that must be considered in determining probable cause. If information is too old, it may have little value in showing that contraband or evidence is still likely to be found in the place for which the warrant is sought. Age alone, however, does not determine staleness." *United States v. Williams*, 124 F.3d 411, 420 (3d Cir. 1997) (discussing *United States v. Harvey,* 2 F.3d 1318, 1322 (3d Cir. 1993)).

"[W]hen an activity is of a protracted and continuous nature, 'the passage of time becomes less significant.'" *Id.* (quoting *United States v. Harris,* 482 F.2d 1115, 1119 (3d Cir. 1973)). "The likelihood that the evidence sought is still at the place to be searched depends on . . . the nature of the crime, of the criminal, of the thing to be seized, and of the place to be searched." *Id.* (quoting *United States v. Tehfe,* 722 F.2d 1114, 1119 (3d Cir. 1983), *cert. denied sub nom., Sanchez v. United States,* 466 U.S. 904 (1984)). In *United States v. Strickland*, the Third Circuit held in a

nonprecedential opinion that "[t]he suspected wrongful conduct, possession of weapons, is by its nature a continuous activity," which necessarily makes passage of time less significant. 237 F. App'x 773, 780 (3d Cir. 2007) (citing *United States v. Maxim,* 55 F.3d 394, 397 (8th Cir. 1995)).

In *Strickland*, the reasoning of which the Court concludes is persuasive even if nonprecedential, the Third Circuit concluded that where (1) the defendant was incarcerated; (2) there was no indication that the defendant's girlfriend moved the gun from his house, and (3) and the nature of possessing weapons is a continuous offense, eight-month-old information was not too stale for there to be reasonable suspicion to conduct a warrantless search of the defendant's home. *Id*. (citing *United States v. Zimmerman*, 277 F.3d 426 (3d Cir. 2002); *United States v. Gettel*, 474 F.3d 1081, 1086 (8th Cir. 2007) (two-month-old evidence of stolen property at residence not stale when the defendant was incarcerated and could not remove it); *United States v. Anderson*, 924 F. Supp. 286, 291 (D.D.C. 1995) (twenty-eight days did not make information relied upon by the warrant affidavit stale)).

Here, unlike *Strickland*, only four months had passed between Person 1's statements to law enforcement and the subsequent search of the Residence. Moreover, a common-sense reading of the Residence Warrant Affidavit suggests with fair probability that the alleged "heavy item" had not been removed from the Residence. Based on Person 1's statement and the later jail audio recordings as paraphrased in the warrant affidavit, the State Court Judge would have a substantial basis to conclude with fair probability that at least one firearm was in the house and that there could be others: Person 1 found a gun in the back of a clock in April 2018; then in August 2018, Almira Stanko told Mr. Stanko that she removed a "heavy item" from the back of the clock and placed it in an upstairs bedroom drawer at the Residence; Mr. Stanko discussed the clock with his girlfriend in August 2018; Mr. Stanko and his mother/girlfriend spoke in whispers and code at

times; and Mr. Stanko referenced three or four more "items" in the basement. In short, the content of the August 2018 jail phone calls "refreshed" the body of information available to the warrant affiant and tied the April 2018 observations of Person 1 to the world as it existed in August 2018, dissipating any staleness issue. Thus, the four months between the initial Person 1 statements and the execution of the search warrant do not make the information stale.

The Court thus concludes that based on the totality of the circumstances presented by the Residence Warrant Affidavit seeking authority to search Mr. Stanko's Residence, the State Court Judge had a substantial basis to conclude that probable cause existed. The Motion to Suppress the physical evidence seized from the Residence search will be denied.

### 2.   **The Storage Unit Search: Probable Cause**

Looking next to the search of the Storage Unit, Mr. Stanko first argues that the State Court Judge had no substantial basis to conclude that there was probable cause sufficient to issue the Storage Unit warrant because the affidavit of probable cause "relies on four informants/witnesses" but "fails to set forth any information relating to their veracity or basis of knowledge." (ECF No. 63, at 7.) And second, Mr. Stanko contends that the information relied on by the affidavit is stale because (a) it was based on conversations law enforcement had with Storage Unit authorities in April 2018, four months prior to the August 2018 search; and (b) "it has not been conclusively established . . . that Mr. Stanko was the only individual with access and/or control over the unit," making the four-month passage of time more significant. (*Id*. at 11, 12.)

In opposition, the Government argues that the Storage Unit Warrant Affidavit's reliance on statements made by various witnesses is supported because each witness had personal knowledge on which they based their statements to law enforcement. Regarding the first named witness relied on by the Storage Unit Warrant Affidavit ("Witness 1"), the Government contends

that the affidavit "specifically states that [Witness 1, who is named in the affidavit,] . . . had personal knowledge of the defendant in that she lived with him for nine years." (ECF No. 64, at 4.) Moreover, Mr. Stanko's own statements made in the later-confiscated jail note and the jail audio recordings "further corroborated Witness 1's statement that the defendant kept firearms in the trunk of a car in the storage unit." (*Id.*) The statements and hand gestures, allegedly imitating a gun, that Mr. Stanko made to "Person 2" as stated in the warrant affidavit also corroborated Witness 1's statement. (*Id.*) Finally, as for the various Storage Unit employees' statements to law enforcement, the statements were based on "personal knowledge of the renters of the storage units and the contents of said storage units." (*Id.*) Based on the consistent and corroborating information presented to the State Court Judge in the Storage Unit Warrant Affidavit as to what would be found in the storage unit, both as to vehicles and as to the guns, the Government argues that the State Court Judge reasonably relied upon the witnesses' statements and observations.

Regarding Mr. Stanko's staleness argument, the Government asserts that although Witness 1's statement to law enforcement was made in April 2018, the Storage Unit Warrant Affidavit "provides information that, as of the day before [the search was executed], the defendant had communicated to a witness that a firearm was located in the storage unit." (*Id.* at 7.) Finally, the Government again argues that "even if the [State Court Judge] had only relied upon the prior statements of witnesses," staleness would not be an issue because "possession of firearms is considered a continuing offense[;] the defendant lacked opportunity to remove the evidence[; and] firearms are of the type of evidence that are typically kept with personal effects and for long duration." (*Id.*)

### a.  <u>Reliance on the Affiant's Sources</u>

The Court concludes that from a totality-of-the-circumstances viewpoint, the Storage Unit Warrant Affidavit set forth information sufficient for the issuing authority to assess the witnesses'

veracity and/or basis of knowledge, such that the State Court Judge had a substantial basis to conclude with fair probability that there were firearms in Mr. Stanko's Storage Unit. The flexible, totality-of-the-circumstances standard a court must employ when reviewing a judge's probable cause determination includes the State Court Judge's assessments of a witness's veracity or basis of knowledge. *See Yusef*, 461 F.3d at 384–85 (citing *Ritter*, 416 F.3d at 263). The Court restates that standard here: "the task . . . is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit[,] . . . including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Yusef*, 461 F.3d at 390 (alterations and omissions in original) (internal quotation marks omitted) (quoting *Gates*, 462 U.S. at 235).

By arguing that the Storage Unit Warrant Affidavit "fails to set forth any information relating to the informants' . . . veracity and/or basis of knowledge," Mr. Stanko asks this Court to engage in the type of hyper-technical review of the State Court Judge's probable cause determination that the Third Circuit and Supreme Court "have warned against." *Id.* (alteration in original) (quoting *In re Application of Adan*, 437 F.3d 381, 397 n.7 (3d Cir. 2006)). Rather, a probable cause determination requires courts "to consider the cumulative weight of the information set forth by the investigating officer in connection with reasonable inferences that the officer is permitted to make based upon the officer's specialized training and experiences." *Id*. (citing *Arvizu,* 534 U.S. at 275). Here, the Government may "show by the totality of the circumstances . . . that the information [provided by informants] has been corroborated through independent investigation."

Thus, to take the "divide-and-conquer" approach suggested by Mr. Stanko and assess each of the factual assertions made in the Storage Unit Warrant Affidavit's only in isolation would run contrary to well-established Third Circuit and Supreme Court precedent. *Id*. In the Search Unit

Warrant Affidavit, the State Court Judge knew the names of all the witnesses relied on by the affidavit, and the affiant also explained that the woman who, in April 2018, "reported that [Mr. Stanko] kept firearms in the trunk of that vehicle" lived with Mr. Stanko for more than nine years. (ECF No. 63-2, at 4.) That lengthy cohabitation has the effect of establishing credibility. *See Teeple*, 2009 WL 5033964, at *23. The Pennsylvania State Police then continued an independent investigation into the Storage Unit and its contents by speaking with Storage Unit employees in April 2018 and again in August 2018, during which they also obtained Mr. Stanko's "MoneyGram written to the Walnut Avenue Apartments"—Mr. Stanko being the only renter of the Walnut Avenue location at that time.[6] (ECF No. 63-2, at 4.). Moreover, each witness corroborated key parts of the statements of others as to the contents of the Storage Unit, more specifically, the presence of the "show car" and other motorcycles stored there (which motor vehicle registration records showed

---

[6] As further support that the Storage Unit Warrant Affidavit lacks probable cause, Mr. Stanko points out that "not all informants are aware that officers will use their statements in a warrant," (*id.* (citing *United States v. Hodge*, 714 F.3d 380, 385 (6th Cir. 2013))), and that "not all informants are aware that false statements might lead to prosecution." (*Id.* at 9 (citing *United States v. Braden*, 248 F. App'x 700, 706 (6th Cir. 2007) (Moore, J. dissenting)).) Finally, Mr. Stanko suggests, without citing any authority, that a "job title or employer name . . . in and of itself does not establish the reliability of the information." (*Id.* at 9.)

As to Mr. Stanko's final point, the warrant affidavits included far more than the informants' job titles. As for the Storage Unit Warrant Affidavit, that warrant also includes corroborating information from other informants: a confiscated note, jail audio recordings, and the fruits of the Residence Search. To assess the warrant affidavit through the lens Mr. Stanko suggests would be ignoring this Court's obligation to conduct a common-sense review of the "cumulative weight of information" that the State Court Judge considered in making a probable cause determination. Moreover, the propositions that Mr. Stanko raises—*i.e.*, that these "[p]ractical considerations . . . caution against giving dispositive weight to an informant's tip merely by virtue of [the informant] being named in the affidavit" (ECF No. 63, at 8)—are unsupported by the nonbinding precedent he cites. *Hodge*, 714 F.3d at 384–85 ("Statements from a source named in a warrant application . . . are generally sufficient to establish probable cause without further corroboration because the legal consequences of lying to law enforcement officials tend to ensure reliability."); *Braden*, 248 F. App'x at 706 (majority holding that "[b]ecause the affidavit named [the informant] herself as having personally observed drugs at [the] residence, the magistrate could credit [the informant's] tip, volunteered against her interest, as reliable without police corroboration or other indicia of reliability").

Here, the Court concludes that whether the informants knew that "false statements might lead to prosecution," or whether they were "aware that officers will use their statements in a warrant" does not change this Court's ultimate conclusion that the State Court Judge had a substantial basis to conclude probable cause existed based on a common-sense review of the cumulative weight of the information included within the Storage Unit Warrant Affidavit. *Gates*, 462 U.S. at 245 (explaining that "corroboration through other sources of information" is "enough for purposes of assessing probable cause" (citing *Jones v. United States*, 362 U.S. 257, 269, 271 (1960))).

were of the type that Mr. Stanko owned), and the presence of one or more guns in the trunk of the "show car."

In sum, the Search Unit Warrant Affidavit "lists several allegations [made by a woman who lived with Mr. Stanko for nine years in April 2018; made by several Storage Unit employees in April 2018 and again in August 2018; and made by a person whose name was redacted but who spoke with Mr. Stanko in August 2018] that, when taken together" with the paraphrased jail audio recordings; the confiscated jail note; and the fruits of the Residence search, establish a substantial basis for the State Court Judge to conclude probable cause existed to issue the Storage Unit search warrant. *Yusef*, 461 F.3d at 392. Stated another way, the "cumulative weight of the information set forth by the investigating officer" in the affidavit gave the State Court Judge grounds to conclude there was a "fair probability" that firearms or the like would be found in the Storage Unit.[7] *Id.* at 390.

---

[7] Mr. Stanko challenges two searches and the warrants that supported them—the search of the Residence and the search of the Storage Unit. The Court has considered and resolves here the challenges to each search separately. That said, the affidavit in support of the Storage Unit warrant referenced, among a number of things, the results of the search of the Residence. In light of Mr. Stanko's challenge to the Residence warrant and search, and his efforts to suppress the fruits of that search, the Court believes that it is appropriate to also consider the validity of the Storage Unit search and the related warrant as if the fruits of the Residence search were excluded from consideration. *See United States v. Herrold*, 962 F.2d 1131, 1138 (3d Cir. 1992) (quoting *United States v. Vasey*, 834 F.2d 782, 788 (9th Cir. 1987) ("[T]he mere inclusion of tainted evidence in an affidavit does not, by itself, taint the warrant or the evidence seized pursuant to the warrant . . . . A reviewing court should excise the tainted evidence and determine whether the remaining, untainted evidence would provide a neutral magistrate with probable cause to issue a warrant.")).

The Court concludes that while the inclusion of the fruits of the Residence search in the Storage Unit Warrant Affidavit certainly bolsters the probable cause support for the Storage Unit warrant, that warrant and search were fully supported by probable cause even if the fruits of the Residence search were not considered. Had the Residence search never occurred or had the State Court Judge issued the Residence search warrant without a substantial basis or with insufficient indicia of probable cause, the Storage Unit Warrant Affidavit—even without considering the fruits of the Residence search—still contains sufficient indicia of probable cause such that the State Court Judge who issued the warrant had a substantial basis to conclude that there was probable cause to search the Storage Unit for firearms.

Eliminating the reference to the fruits of the Residence search from the Storage Unit Warrant Affidavit, the Storage Unit Warrant Affidavit's indicia of probable cause that the Storage Unit and its contents were Mr. Stanko's; that there had been guns observed there; that there was a reasonable basis to conclude that the guns remained there; and that Mr. Stanko possessed guns can be summarized as follows:

(1) One year's worth of rent for the Storage Unit paid by Mr. Stanko in January 2018 via MoneyGram;
(2) Statements made in April 2018 by a woman who lived with Mr. Stanko for over nine years, reporting that Mr. Stanko had a "show car" and at least two Harley Davidson motorcycles in the unit. She also stated she believed there to be firearms in the trunk of the "show car" in the Storage Unit; (cont.)

### b. **Staleness**

For the same reasons the Court concluded that the Residence Warrant Affidavit did not

rely on state information based on a four-month period of time, the Court concludes that the four-

month passage of time between the April 2018 witness statements and the August 2018 Storage

Unit search does not render the information relied on by that warrant affidavit stale. *See Williams*,

---

(3) Corroborating statements made by several Storage Unit employees in April 2018 and again in August 2018 reporting that Mr. Stanko rents the Storage Unit and keeps a "show car" there;

(4) Corroborating statements made by a person (referred to as "P2") who spoke with Mr. Stanko in August 2018 about the Storage Unit and contents within it. During that conversation, P2 reported to police that Mr. Stanko used code and hand gestures allegedly imitating a gun to suggest the presence of firearms within the Storage Unit. P2 also noted that Mr. Stanko kept a "show car" and Harley Davidson motorcycle in the unit;

(5) Confirmation by the affiant that a 1981 Pontiac Firebird and two Harley Davidson motorcycles are registered in Mr. Stanko's name;

(6) A confiscated note written by Mr. Stanko from jail in August 2018 to his mother/girlfriend asking "Do they know anything about my garage?" alongside instructions to pay the Storage Unit's rent via money order or check and instructions regarding how to care for the car located in the unit;

(7) The credible report that a loaded semi-automatic handgun had been seen in the back of a clock at the Residence and had been moved to a dresser drawer in the Residence;

(8) The August 2018 paraphrased jail audio recordings.

(ECF No. 63-2.)

As noted earlier, district courts are to employ a flexible, totality-of-the-circumstances standard when reviewing an issuing authority's probable cause determination, including the issuing authority's assessments of a witness's veracity or basis of knowledge. *See Yusef*, 461 F.3d at 384–85 (citing *Ritter*, 416 F.3d at 263). "[T]he task . . . is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit[,] . . . including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Yusef*, 461 F.3d at 390 (alterations and omissions in original) (internal quotation marks omitted) (quoting *Gates*, 462 U.S. at 235).

Applying this standard, the Court concludes that the Storage Unit Warrant Affidavit's indicia of probable cause, even without considering the fruits of the Residence search, present information that is consistently corroborative and supportive of probable cause: a common thread across witnesses' statements is that Mr. Stanko keeps a "show car" and motorcycle(s) in the Storage Unit, that it was Mr. Stanko's storage unit, and that there were guns located there. And the accuracy of these statements is further supported by the confirmation that a Pontiac Firebird and Harley Davidson motorcycles are registered in Mr. Stanko's name. Moreover, the affidavit contains accounts of two people who report that Mr. Stanko kept guns in his Storage Unit, one by a person who lived with Mr. Stanko for a significant period of time and both of whom consistently reported that Mr. Stanko had a "show car" and motorcycle(s) in the unit.

Taken together, this information provided a sufficient foundation for the State Court Judge to conclude with fair probability that guns would be found within the Storage Unit. In addition, the other information set out in the affidavit relative to the "gun gesture" and the observation of a loaded gun in Mr. Stanko's Residence placed his possession and reference to firearms squarely before the issuing judge. Finally, although the Court accords less weight to the August 2018 jail audio recordings because the phone calls do not specifically reference the Storage Unit, the Court nonetheless concludes that the Storage Unit Warrant Affidavit set forth enough indicia for the State Court Judge to conclude there was probable cause to search the Storage Unit and to support the warrant that was issued.

124 F.3d at 420 ("[W]hen an activity is of a protracted and continuous nature, 'the passage of time becomes less significant.'" (quoting *Harris*, 482 F.2d at 1119)).

Mr. Stanko argues the "affidavit fails to account for other individuals having had access and/or control over the storage unit/garage." (ECF No. 63, at 12.) Mr. Stanko tries to cast doubt on the inference that Mr. Stanko maintained control over the unit and its contents, an inference that is presented in part by the MoneyGram "written to the Walnut Avenue Apartments and purported to be signed by Thomas Stanko with his personal address listed on the bottom." (*Id.*) To accept the doubts that Mr. Stanko casts as to who maintained control or custody over the Storage Unit is a hyper-technical reading of the warrant affidavit, the same "divide-and-conquer approach" this Circuit and the Supreme Court do not allow. *Yusef*, 461 F.3d at 390. The State Court Judge had plenty of credible information before it to support the conclusion that the Storage Unit was Mr. Stanko's and that there would be guns found there.

In general, "[t]he likelihood that the evidence sought is still at the place to be searched depends on . . . the nature of the crime, of the criminal, of the thing to be seized, and of the place to be searched." *Williams*, 124 F.3d at 420. As stated above, the Court concludes that the passage of time does not render the warrant affidavit's information stale. This conclusion is based on the offense at issue—possession of a firearm—and the cumulative weight of the information presented by the Storage Unit Warrant Affidavit.

It also need not be "conclusively established in the affidavit that Mr. Stanko was the only individual with access or control over the unit," as Mr. Stanko suggests. (ECF No. 63, at 12.) Rather, all that this Court must conclude is that when the State Court Judge issued the Storage Unit search warrant in August 2018, the State Court Judge had a substantial basis to determine, based on the totality of the circumstances presented, that there was "fair probability" firearms would be

found at the Storage Unit property. *Yusef*, 461 F.3d at 390.

The cumulative information before the State Court Judge can be summarized as follows: (1) the April 2018 Storage Unit employee statements indicating that Mr. Stanko rented the unit and kept a "show car" and/or motorcycles there; (2) the April 2018 statement by a witness who purportedly lived with Mr. Stanko for nine years that corroborates the storage of a "show car" and Harley Davidson motorcycles, and who reported firearms in the car's trunk; (3) the August 2018 employee statements corroborating that Mr. Stanko rented the unit and kept a "show car" there;[8] (4) a MoneyGram written to the Walnut Avenue location purported to be signed by Mr. Stanko; (5) an August 2018 note written by Mr. Stanko to his mother and/or girlfriend asking "do they know about my garage" and giving instructions on care for the vehicle in the garage as well as a request to pay the garage rent "with a money order or check"; (6) the conversation between Mr. Stanko and Person 2, during which Mr. Stanko used hand gestures imitating a gun that the officer affiant inferred was to "convey[] that there are firearms hidden in his garage"; (7) the jail audio recordings; and finally, (8) the fruits of the evidence seized from the Residence search.[9]

---

[8] Mr. Stanko points out that in the Storage Unit Warrant Affidavit, the affiant reported that a Storage Unit employee "gave consent for the search of all Unit's [sic] at the subject property." (*See* ECF Nos. 63, at 10; and 63-2, at 4.) Mr. Stanko argues that "nothing has been established in the affidavit showing the individual had actual authority to consent to a search of the storage unit/garage." (ECF No. 63, at 10.) As noted by the Government, the Court does not and need not address the Storage Unit employee's scope of authority to consent to a search because the search at issue in this case was based on a properly grounded and issued search warrant. (ECF No. 64, at 5 n.1.)

[9] And even if the Court had concluded that the Residence Warrant Affidavit was invalid on its face, the good faith exception applies to uphold the officers' reliance on and execution of it. As such, it follows that the fruits of the Residence search were properly included in the Storage Unit Warrant Affidavit and thus, are part of this Court's common-sense review of the totality of the circumstances presented by the affidavit at issue here. *See United States v. Stearn*, 597 F.3d 540, 569 (3d Cir. 2010) (in assessing whether a magistrate judge had a substantial basis for finding probable cause based on indicia presented in a warrant affidavit, the court took into account fruits discovered during four earlier-in-time searches that were referenced within that warrant affidavit, explaining that those fruits were properly considered as part of its "substantial basis" analysis, even when some of the searches—and the fruits seized during those searches—were permitted into the record via the good faith exception).

In sum, the "cumulative weight of the information set forth by the investigating officer" in the Storage Unit Warrant Affidavit supports this Court's conclusion that the State Court Judge had a substantial basis to conclude there was probable cause to support the issuance of the warrant. Thus, the Court concludes that based on the totality of the circumstances presented by the warrant affidavit to search Mr. Stanko's Storage Unit, the State Court Judge had a substantial basis to conclude with fair probability that probable cause existed to search the Storage Unit for firearms. The Motion to Suppress physical evidence seized from the Storage Unit will be denied.[10]

### 3. The Residence and Storage Unit Search Warrants: The *Leon* Good Faith Exception

The Government argues that even if the Court were to conclude that the State Court Judge did not have a substantial basis to conclude that probable case existed to search the Residence and the Storage Unit based on information provided in the warrant affidavits, the good faith exception, as stated in *United States v. Leon*, 468 U.S. 897 (1984), applies to uphold the executing officers' reliance on and execution of the issued search warrants.

According to the Supreme Court's holding in *Leon*, "[w]hen police act under a warrant that is invalid for lack of probable cause, the exclusionary rule does not apply if the police acted 'in objectively reasonable reliance' on the subsequently invalidated search warrant." *Herring v. United States*, 555 U.S. 135, 143 (2009) (discussing *Leon*, 468 U.S. at 922). "The test for whether the good faith exception applies is 'whether a reasonably well trained officer would have known that the search was illegal despite the magistrate [judge's] authorization.'" *United States v. Loy*, 191 F.3d 360, 367 (3d Cir. 199) (quoting *Leon*, 468 U.S. at 922 n.23). "A warrant represents

---

[10] As to both the Residence Warrant Affidavit and the Storage Unit Warrant Affidavit, there were multiple indicia of probable cause before the State Court Judge that issued the warrants, and the information presented to that judge contained interlocking elements of corroboration that were not present in another recent case in another court involving the search of another property alleged to belong to Mr. Stanko. *See United States v. Stanko*, No. 20-00106, 2021 WL 1750353, at *1 (M.D. Pa. May 4, 2021).

judicial authorization of a particular search or seizure, and it is thought that exclusion will not deter police from relying on an invalid warrant unless the police should reasonably have known that the warrant's issuance would be found unconstitutional." *Virgin Islands v. John*, 654 F.3d 412, 418 (3d Cir. 2011). The Third Circuit has "identified four limited circumstances in which a police officer's reliance on a warrant will not be considered objectively reasonable." *Id*. at 419 (internal quotation marks omitted).

First, "where the magistrate judge issued the warrant in reliance on a deliberately or recklessly false affidavit." *Id.* Second, "where the magistrate judge abandoned his or her judicial role and failed to perform his or her neutral and detached function." *Id*. Third, "where the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id*. Or, fourth, "where the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized." *Id.* (citing *United States v. Tracey*, 597 F.3d 140, 151 (3d Cir. 2010)).

Whether the exclusionary rule applies is a "case-specific analysis." *United States v. Franz*, 772 F.3d 134, 146 (3d Cir. 2014). "The exclusionary rule is not a tool to deter mistaken magistrate judges." *United States v. Wilburn*, No. 18-00115, 2021 WL 1310423, at *20 (W.D. Pa. Apr. 8, 2021) (citing *Davis v. United States*, 564 U.S. 229, 238–39 (2011)). Rather, its application will only be appropriate if exclusion of evidence will "appreciably deter governmental violations of the Fourth Amendment." *United States v. Katzin*, 769 F.3d 163, 170 (3d Cir. 2014) (en banc) (citing *Leon*, 468 U.S. at 909, 918). Accordingly, "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 144. "[T]he Court should consider not only any defects in the warrant but also the officer's conduct in obtaining

and executing the warrant and what the officer knew or should have known. After all, it is the officer's culpability that would drive the suppression of evidence gathered in the execution of a defective warrant." *Wilburn*, 2021 WL 1310423, at *20 (internal citations and quotation marks omitted) (quoting *Franz*, 772 F.3d at 148–49).

Here, the Government argues that "the search warrants in this case were supported by affidavits with detailed factual assertions[.]" (ECF No. 64, at 9.) Specifically, the "affidavit[s] did not contain false or misleading statements, much less deliberately or recklessly false" statements. (ECF No. 49, at 14–15 (internal quotation marks omitted) (quoting *United States v. Hodge*, 246 F.3d 301, 308 (3d Cir. 2001)).) In opposition, Mr. Stanko makes a generalized argument that the "good faith exception does not apply because the warrant was based on an affidavit so lacking in indicia of probable cause as to render belief in its existence entirely unreasonable," *i.e.*, the third circumstance under which it would no longer be objectively reasonable for a police officer to rely on a warrant. *John*, 654 F.3d at 418.

In the Court's estimation, for all the reasons detailed above, neither the Residence Warrant Affidavit nor the Storage Unit Warrant Affidavit are "so lacking in indicia of probable cause to render official belief in its existence entirely unreasonable." *Id*. As the Court has concluded, the warrant affidavits simply were not lacking in probable cause at all, let alone in such a visibly deficient way that the executing police officers should have disclaimed reliance on the warrants. And none of the other three limited circumstances raised by the Third Circuit's interpretation of *Leon* apply either.

Taking a closer look at the law enforcement's process of obtaining and executing the warrants in this case, the record does not demonstrate that the police conduct at issue here was "sufficiently deliberate" as to recklessness, nor "sufficiently culpable." *Wilburn*, 2021 WL 1310423,

26

at *20 (internal quotation marks omitted) (quoting *Herring*, 555 U.S. at 144). Instead, the amount of time that elapsed between the initial witnesses' tips to law enforcement officials—specifically, in the Residence Warrant Affidavit situation, the passage of time between Person 1's statements and the jail audio recordings before the officer sought a warrant—supports a finding that in "obtaining and executing the [first] warrant," the officers did not deliberately act on a warrant that they knew or should have known was facially lacking in probable cause indicia. *Id.*

In fact, and as the Court noted at oral argument on the Motion to Suppress, the warrant affidavits, if anything, seem to understate the incriminating substance of the jail audio recordings between Mr. Stanko and his mother and girlfriend. The conversations in the jail audio recordings allude to a firearm, *e.g.*, the "heavy object" found in the back of the clock and indicate that said "heavy object" was moved from the back of the clock to an upstairs bedroom in the Residence. The jail audio recordings also consist of Mr. Stanko speaking in whispers and "code," as he consistently references the clock, the basement, and three or four more items in the "Christmas decorations" (in calls in August). (*See* Jail Audio Recordings, "08-20-18 18-09.mp3" at 1:27–4:45, 6:50; "08-20-18 18-19.mp3" at 0:35, 1:14–2:30, 6:23–7:05; "08-20-18 - 20-27.mp3" at 6:30–7:30; 8:05–8:25; "08-23-18 - 19-07.mp3" at 4:30, 5:00–5:31, 6:20–7:20, 7:30–7:50, and 10:30.) As such, the officers' behavior in obtaining and executing the Residence search warrant did not strike the Court as the "deliberate misconduct" or "flagrant disregard for the law" necessary to forfeit the good faith exception's applicability. Instead, based on the record before the Court, there is no basis to fairly conclude that the executing officers engaged in any misconduct or disregard of the law at all in these regards.

As for the Storage Unit Warrant Affidavit and the subsequent search, the same reasoning applies. Based on the detailed factual assertions within the affidavit; the substance of the jail audio recordings; and course of the officers' conduct in obtaining and executing the search warrant, nothing

within the record suggests that the officers are culpable as having acted in deliberate disregard for Mr. Stanko's Fourth Amendment rights, or that "the affidavit [was so] lacking in indicia of probable cause to render official belief in its existence entirely unreasonable." *John*, 654 F.3d at 419. Instead, the record reflects the detailed and engaged, and to a large degree patient and methodical, efforts of a lawful investigation into Mr. Stanko's Storage Unit and the probable contents within it.

Law enforcement spoke with several Housing Authority employees and one person who had previously lived with Mr. Stanko for nine years. The statements made by these individuals were consistent across the board and had the effect of corroborating one another. In obtaining the Storage Unit search warrant, the officers also relied on the (1) the substance of the jail audio recordings, which the affiant officer then paraphrased in the affidavit, and (2) the physical evidence obtained from the Residence search and the information that was relied upon to obtain the Residence warrant––which, as stated in the affidavit, included four firearms, one of which was reported as stolen. Taken together, these detailed factual assertions indicate that there was sufficient indicia of probable cause for the officers to reasonably believe in the existence of probable cause and to reasonably rely on the warrant and its authorization to search. Stated again, nothing within the record would lead this Court to conclude that the Storage Unit Warrant Affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *John*, 654 F.3d at 418.

None of the recognized limitations on the application of the *Leon* doctrine are present in the record here. The executing officers relied on facially valid search warrants, issued in the ordinary course by a judge of competent jurisdiction. The record does not demonstrate the there was anything about the affidavits supporting them, or the face of the warrant, that would have suggested to a reasonable police officer that executing either warrant was contrary to the law, or that the Third Circuit's limitations on the *Leon* "good faith" exception would apply to obviate suppression in any event.

For all of the above reasons, the Court denies the motions to suppress the fruits of the Residence and Storage Unit searches.

### B. **Remaining Pretrial Motions**

For the following reasons, the Court will grant in part and deny in part each of the remaining pretrial motions filed by Mr. Stanko. "Criminal pretrial discovery is . . . vastly different from discovery in civil cases." *United States v. Ramos*, 27 F.3d 65, 67–68 (3d Cir. 1994). Federal Rule of Criminal Procedure 16 "delineates the categories of information to which defendants are entitled in pretrial discovery" and "some additional material [is] discoverable in accordance with statutory pronouncements and the due process clause of the Constitution." *Id*. The Court will address each of the pretrial motions in accord with those principles.

### 1. **Motion to Produce 404(b)and 609 Evidence (ECF No. 37)**

Mr. Stanko moves this Court to enter an order compelling the Government to produce evidence that it intends to use at trial under Federal Rules of Evidence 404(b) and 609. Specifically, Mr. Stanko seeks in advance "a statement containing the nature, dates, and places of occurrences of any criminal offenses or acts of misconduct other than those specified in the [i]ndictment that the prosecution will attempt to prove at trial." (ECF No. 37). Regarding Rule 404(b) evidence, the Government responds that it has "not yet identified the specific bad acts by the defendant that it will seek to introduce at trial" but "submits that providing 404(b) notice three weeks prior to trial is reasonable and will allow the defendant 'a fair opportunity' to prepare for said evidence prior to trial." (*Id*. at 5.) As for evidence it intends to bring under Federal Rule of Evidence 609(b), the Government "submits that providing said notice to the defendant two weeks prior to trial provides ample opportunity for the defendant to contest its use[.]" (*Id*.)

Under Federal Rule of Evidence 404(b), the Government shall "provide reasonable notice of any [evidence of other crimes, wrongs, or acts offered to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident] that the prosecutor intends to offer at trial, so that the defendant has a fair opportunity to meet it." Under the recently amended version of that Rule, the Government must also "articulate in the notice the permitted purpose for which the prosecutor intends to offer the evidence and the reasoning that supports the purpose." Fed. R. Evid. 404(b)(3)(B). The purpose of this pretrial notice requirement is to "reduce surprise and promote early resolution on the issue of admissibility." *United States v. Blackwell*, 954 F. Supp. 944, 968 (D.N.J. 1997) (quoting *United States v. Williams*, 792 F. Supp. 1120, 1133 (S.D. Ind. 1992)). "What constitutes 'reasonable notice in advance of trial' is determined by the circumstances and complexity of the prosecution." *United States v. Underwood*, No. 17-00324, 202 WL 5107558, at *1 (W.D. Pa. Aug. 31, 2020) (quoting *Williams*, 792 F. Supp. at 1133). As for Federal Rule of Evidence 609, this rule requires that the Government provide notice to a defendant of its use of a conviction older than ten years as impeachment evidence with enough time so "that the party has a fair opportunity to contest its use." Fed. R. Evid. 609(b)(2).

The Government submits that it will disclose to Mr. Stanko any prior bad acts evidence it intends to bring pursuant to Rule 404(b) three weeks prior to trial. The Court concludes that on the record now before it, three weeks' advance notice will give counsel for Mr. Stanko reasonable notice and time to prepare. *See Blackwell*, 954 F. Supp. at 968 (collecting cases where seven days, ten days, or two weeks' notice were sufficient timeframes to give defendants a reasonable amount of time to prepare for trial). Moreover, the complexity of this case—which involves a two-count charge for a felon in possession of firearms—is more minimal, an additional circumstance making three weeks' notice sufficient. The Court will therefore grant Mr. Stanko's Motion to the extent

that the Government submits it will turn over its relevant Rule 404(b) notice and evidence at least three weeks prior to trial.

Second, the Government submits that it will provide to Mr. Stanko a statement of its intent to present any Rule 609 evidence two weeks prior to trial. (ECF No. 49, at 5.) The Court concludes that on the record now before it, that two weeks will give Mr. Stanko reasonable notice and ample opportunity to contest its use at trial. *Underwood*, 2020 WL 5107558, at *2 (directing the government to provide notice to the defendant of its intent to use Rule 609(b) evidence ten days prior to trial). Accordingly, the Court grants in part Mr. Stanko's motion insofar as the Government will disclose Rule 609 evidence two weeks prior to trial.

### 2. <u>Motion to Compel Disclosure of Plea Bargains, Preferential Treatment, and Promises to Government Witnesses (ECF No. 38)</u>

Mr. Stanko next seeks to compel the Government to "disclose plea bargains, preferential treatment, and promises of any nature to Government witnesses" as well as a "full and complete statement of the nature and extent of any such bargain, preferential treatment, or promises." (ECF No. 38, at 1–2.) The Court agrees with the Government in terms of categorizing the information sought through this Motion as impeachment material under *Giglio. United States v. Milan*, 304 F.3d 273, 287 (3d Cir. 2002). "[Under *Giglio*,] the government must disclose materials that go to the question of guilt or innocence as well as materials that might affect the jury's judgment of credibility of a crucial prosecution witness." *Id.* (citing *United States v. Bagley*, 473 U.S. 667, 676–77 (1985)). The Government must disclose information categorized as *Giglio* material "in time for its effective use at trial." *United States v. Higgs*, 713 F.2d 39, 44 (3d Cir. 1983).

The Government submits that it will disclose any *Giglio* information two weeks before trial alongside its parallel Jencks Act disclosures. (ECF No. 49, at 9.) The Court concludes that on the record as it now exists, such disclosures two weeks in advance of trial will give Mr. Stanko's counsel

31

a reasonable amount of time to prepare for "its effective use of trial." *Higgs*, 713 F.2d at 44. Accordingly, the Court grants in part Mr. Stanko's Motion insofar as the Government shall disclose the requested information constituting *Giglio* material at least two weeks in advance of trial.

### 3. Motion for Discovery (ECF No. 39)

Next, Mr. Stanko moves to compel early disclosure of information that can be grouped into the following criminal pretrial discovery categories: (1) information that falls within the initial disclosure requirements of Federal Rule of Criminal Procedure 16; (2) expert report disclosures pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G); (3) preservation of physical evidence in the custody or care of the Government relating to the arrest in this case; (4) information constituting *Brady* material; (5) information constituting Jencks Act material; and (6) information constituting *Giglio* material. (ECF No. 39, at 1–8.) The Court will address each category of evidence in turn.

### a. Rule 16 Requests: Sections 5.a–5.d, 5.f, and 5.h of Mr. Stanko's Motion

Regarding discovery items listed in sections 5.a through 5.d, 5.f, and 5.h of Mr. Stanko's Motion, the Court concludes that the Government has already disclosed the information sought in its initial Rule 16 disclosures, as reflected in the "Receipt for Local Criminal Rule 16 Material" at ECF No. 15. Mr. Stanko does not advance an argument that such has not occurred. Moreover, the Government submits that it continues to provide additional materials upon request by Mr. Stanko. As such, to the extent this Motion seeks information already disclosed to Mr. Stanko via Federal Rule of Criminal Procedure 16, and this Court's Local Rule equivalent, the Motion is denied without prejudice as moot.

### b. Expert Disclosure Request Pursuant to Rule 16: Section 5.t

Next, the Court will deny without prejudice Mr. Stanko's Motion for Discovery to the extent it seeks disclosure of expert reports. (*See* ECF No. 39, at 8(t).) The Government submits

that it has already provided Mr. Stanko with a copy of its interstate nexus expert report pursuant to Rule 16(a)(1)(G) and has no additional anticipated experts at this time. (ECF No. 49, at 8.) The Government further states that "should [it] elect to engage in further expert witnesses, the [G]overnment will provide to the defendant a curriculum vitae and a summary of the intended testimony of said expert no later than three weeks before trial." (*Id.*)

In the Court's estimation, three weeks' time should on the record as it now exists "provide [Mr. Stanko] with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." Fed. R. Crim. P. 16(a)(1)(G), Advisory Committee's note to 1993 amendment. And should such disclosure not be sufficiently timely, the Court can address that situation at that time. Accordingly, the Court will deny without prejudice Mr. Stanko's motion as moot—to the extent it seeks additional disclosures of expert reports that do not exist at this point. Should the Government later decide to include more expert witnesses, the Government is directed to disclose those expert reports promptly upon receipt and in any event not later than three weeks in advance of trial. Should Mr. Stanko then and there believe that as to a specific then-disclosed expert that such time interval is insufficient, he may at that time make a further request for more time to consider the matter, including the need to obtain a "counter-expert." As such, the Government is *strongly* encouraged to give Mr. Stanko's counsel as much notice as is possible of any later-arriving expert.

**c.   Request for Preservation of Evidence: Section 5.g**

Mr. Stanko requests "that all videotapes, dispatch tapes, or any other physical evidence that may be destroyed, lost, or otherwise put out of the possession, custody, or care of the Government and which relate to the arrest or the events leading to the arrest in this case be preserved." (ECF No. 39, at 4.) The Government does not specifically respond to this request. The Government is under a "duty to preserve evidence that (1) possesses an apparent exculpatory value, and (2) is of

such a nature that the defendant would be unable to obtain comparable evidence by other available means." *United States v. Sherman*, 29 F. App'x 158, 160 (3d Cir. 2008) (citing *California v. Trombetta*, 467 U.S. 479, 489 (1984)). Thus, the Court grants Mr. Stanko's request as set forth in section 5.g of his Motion to the extent that the Government must preserve evidence that has apparent or plausible exculpatory value or is "of such a nature that the defendant would be unable to obtain comparable evidence by other available means." *Id*. And, in furtherance of this directive, the Government shall notify all involved law enforcement agencies and personnel to do the same.

### d.   Disclosure of *Brady*, *Giglio*, and Jencks Act Material: Sections 5.i–5.s

The Court will grant in part Mr. Stanko's Motion seeking early disclosure of material that falls under one, or a combination of, the following categories: *Brady*, *Giglio*, or Jencks Act material. (ECF No. 39, at ¶¶ 5.i–5.s.)

Regarding *Brady* material, the Government states that it is aware of its obligation under *Brady* and submits that at the time of the briefing, it was unaware of any information that "must be disclosed pursuant to *Brady*." (ECF No. 49, at 10.) The Government further submits that it "will produce it to the defendant in such time that the defendant may make use of it" and "will also comply with any reasonable request by [Mr. Stanko]." (*Id*.) "No denial of due process occurs if *Brady* material is disclosed . . . in time for its effective use at trial." *Higgs*, 713 F.2d at 44. Based on the Government's submission that it will disclose any *Brady* information that comes to light "in such time that the defendant may make use of it," and has already disclosed any *Brady* material that it knows of, the Court is satisfied that the Government understands its duty under *Brady*. Nonetheless, the Court will grant Mr. Stanko's Motion for Discovery seeking early disclosure of *Brady* material to the extent that the Government shall disclose *Brady* information on a rolling basis

from this point forward and as it would be discovered by the Government,[11] and in any event not later than two weeks prior to trial.

Next, the requests set forth in sections 5.i–5.o as well as 5.r, in the Court's estimation, can be considered as relating to *Giglio* and/or *Brady* material. To the extent that the Government submits it will turn over *Giglio* information two weeks in advance of trial, the Court grants in part Mr. Stanko's Motion, as modified by the Government's submission. The Government, however, objects to blanket compliance with Mr. Stanko's Motion. It argues that "some of [Mr. Stanko's] requests exceed the scope of materials that must be disclosed to him," *e.g.*, his requests for "any evidence that any prospective witness is under investigation by federal, state, or local authorities for any criminal conduct"—referring to information sought in section 5.l of the Motion—because disclosure of such information "could lead to the compromise of sensitive investigations[.]" (ECF No. 49, at 9.)

As a threshold matter, the Court does not here order blanket compliance with the exact contents of Mr. Stanko's request and only grants the Motion insofar as the dates for pretrial disclosures as submitted by the Government are confirmed. Based on the Government's submission that "it is aware of, and will comply with, its obligations under *Giglio*" as well as *Brady* material (ECF No. 49, at 9–10), the Court is confident that the Government is aware of its constitutional duties. In such regard, the Court confirms that the obligations for disclosure of *Brady* (as well as *Giglio*) material is ongoing from the inception of a prosecution, and the United States is expected to fulfill such obligations on a timely basis.

The Court, however, will briefly address the scope of the Government's disclosure duties to address the concerns raised by the United States. The Government relies on *United States v. Ruiz*, 536 U.S. 622, 629 (2002) for the proposition that "the [G]overnment is not required to

---

[11] To the extent that the Government would believe that this timing would pose a genuine risk of harm to any person, the Court would consider such in the specific circumstances as would be presented to the Court via motion.

disclose impeachment material relating to informants or other witnesses" where premature disclosure "could disrupt ongoing investigations, expose prospective witnesses to serious harm, and would place a substantial burden on the [G]overnment prior to trial preparation." (ECF No. 49, at 6 (internal quotation marks omitted) (quoting *Ruiz*, 536 U.S. at 631–32).) The issue before the Supreme Court in *Ruiz* is distinguishable from this case. In *Ruiz*, the Supreme Court addressed "whether the Constitution requires [a] preguilty plea disclosure of impeachment information." 536 U.S. at 629. Here, the Court is assessing whether the Government must disclose the requested information in advance of trial generally. To the Court's knowledge, the issue here does not involve whether information should be disclosed prior to a guilty plea, so *Ruiz* is not necessarily instructive of the Government's disclosure duties in this case.

Mr. Stanko's Fifth Amendment Due Process rights and Sixth Amendment confrontational rights require the Government to disclose any materials or information that go "to the question of guilt or innocence as well as materials that might affect the jury's judgment of credibility of a crucial prosecution witness" under *Giglio* as well as information "favorable to the accused [that is] . . . material either to guilt or punishment" under *Brady. See Brady v. Maryland*, 373 U.S. 83, 87 (1947); *Milan*, 304 F.3d at 287. The Supreme Court has made plain that there is "no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case." *Moore v. Illinois*, 408 U.S. 786, 795 (1972). As stated by the Ninth Circuit, the reasoning of which the Court finds persuasive in the context presented by Mr. Stanko's Motion: "*Brady* does not require a prosecutor to turn over files reflecting leads and ongoing investigations where no exonerating or impeaching evidence has turned up." *Downs v. Hoyt*, 232 F.3d 1031, 1037 (9th Cir. 2000) (citing *United States v. Agurs*, 427 U.S. 97, 109 (1976)).[12]

---

[12] The Ninth Circuit's holding is consistent with other courts' rulings. *See United States v. Bowie*, 198 F.3d 905, 909 (D.C. Cir. 1999) (holding that under *Brady*, the government had a duty to disclose information that a (cont.)

The Government submits that it understands its obligations under *Brady* and *Giglio*. While the Court does not find it necessary to mandate blanket disclosures in accord with Mr. Stanko's broad requests, it may turn out that the Government's obligations do, indeed, extend to information about "ongoing investigations" of witnesses where that information is "exonerating or impeaching." *Id*. Thus, the Court grants Mr. Stanko's Motion to the extent that the Government shall disclose *Giglio* and *Brady* material on an ongoing as it is discovered by the Government. Should the Government conclude that some specific mandated disclosure would likely implicate the safety of any person, that specific matter may be presented to the Court for a more specific resolution. And in any event, all *Brady* and *Giglio* material shall be turned over to defense counsel not later than two weeks before the commencement of trial.

Finally, Mr. Stanko moves this Court to compel early disclosure of Jencks Act material. (ECF No. 39, at ¶¶ 5.p and 5.q.) The Government indicates that it will voluntarily disclose any Jencks Act material two weeks in advance of trial. (ECF No. 49, at 8–9.) By its submission that it will provide Mr. Stanko with Jencks Act disclosures two weeks in advance of trial, the Government goes beyond what is required of it by statute. *See* 18 U.S.C. § 3500(b). With that acknowledgement, the Court nonetheless grants Mr. Stanko's Motion insofar as the Government shall disclose this information to Mr. Stanko two weeks in advance of trial.

---

government witness was under investigation before trial because such information could go to the witness's credibility or bias during cross-examination); *United States v. Ullah*, No. 04-30A(F), 2005 WL 629487, at *11 (W.D.N.Y. Mar. 17, 2005) (reminding the government of its duty under *United States v. Kyle*, 514 U.S. 419, 437 "to learn of any favorable evidence known to others, acting on the government's behalf in the case, including the police" after the government asserted that it was unaware of prospective witnesses under criminal investigation). Moreover, the case Mr. Stanko cites as support for compelling disclosures of this nature is consistent with the Ninth Circuit's iteration of *Brady/Giglio* disclosures. *See United States v. Chitty*, 760 F.2d 425, 428 (2d Cir. 1985) (holding that information that a witness had been told that he was under investigation was discoverable under *Brady* and/or *Giglio* because "it provided a motive to testify favorably to the [g]overnment").

**4.** **Motion to Compel Government to Disclose Identity of Any Expert Witness (ECF No. 40)**

In a Motion somewhat duplicative of the information sought by Mr. Stanko in his Motion for Discovery at ECF No. 39, Mr. Stanko again moves the Court to compel disclosure of the identity of any expert witness the Government intends to call at trial and the nature of the expert testimony. (ECF No. 40.) As noted above, the Government states that it has already disclosed its interstate nexus expert report to Mr. Stanko and that at this point, it does not intend to call any other expert witnesses. The Government further provides that if it does intend to call an additional expert witness, it will provide Mr. Stanko "with a curriculum vitae and a summary of the intended testimony of said expert no later than three weeks before trial." (ECF No. 49, at 8.) As the Court concluded above, three weeks' advance notice will likely provide counsel for Mr. Stanko "a fair opportunity to test the merit of the expert's testimony through focused cross-examination." Fed. R. Crim. P. 16(a)(1)(G), Advisory Committee's note to 1993 amendment. Accordingly, the Court will deny without prejudice Mr. Stanko's Motion at ECF No. 40.

**5.** **Motion for Early Disclosure of All "Jencks Act" Material (ECF No. 41)**

Finally, Mr. Stanko filed a Motion for Early Disclosure of All "Jencks Act" Material, requesting that this Court "order the production of Jencks Act materials thirty (30) days prior to trial." (ECF No. 40, at 2.) As observed by Mr. Stanko in his own Motion, the Jencks Act only requires that the Government produce material identified by the Jencks Act before a witness testifies at trial. *See United States v. Weaver*, 267 F.3d 231, 245 (3d Cir. 2001) (discussing 18 U.S.C. § 3500). Here, the Government submits that it will voluntarily disclose Jencks Act material to Mr. Stanko two weeks before trial. As a result, the Court will grant Mr. Stanko's Motion at ECF No. 41 to the extent that the Government shall disclose Jencks Act material two weeks in advance of trial.

IV.   **CONCLUSION**

The Court concludes that the State Court Judge who issued the warrants to search Mr. Stanko's Residence and his rental Storage Unit had a substantial basis to conclude that probable cause to search existed, and in any event, that the good faith exception would apply in both instances to uphold the executing officers' reliance on the issued search warrants. Accordingly, the Court denies Mr. Stanko's Motion to Suppress, and the physical evidence discovered will remain in the record and in the case. (ECF No. 43.)

Second, the Court grants in part and denies in part, as outlined above, the remaining pretrial discovery motions filed by Mr. Stanko. (ECF Nos. 37, 38, 39, 40, and 41.) The Government has already either satisfied its duty to disclose the information Mr. Stanko requests, or the Government has indicated its intent to disclose certain information reasonably in advance of trial.

An appropriate Order will follow.

  s/ Mark R. Hornak
Mark R. Hornak
Chief United States District Judge

Dated:  June 9, 2021

cc:      All counsel of record